[Cite as *State v. Thomas*, 2012-Ohio-4139.]

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
|---|---|---|---|
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | | |

| | | | |
|---|---|---|---|
| STATE OF OHIO | | | C.A. No. 26244 |
| Appellee | | | |
| v. | | | APPEAL FROM JUDGMENT ENTERED IN THE |
| DARAN E. THOMAS | | | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | | | CASE No. CR 11 08 2151 |

DECISION AND JOURNAL ENTRY

Dated: September 12, 2012

WHITMORE, Presiding Judge.

{¶1} Defendant-Appellant, Daran Thomas, Jr., appeals from his conviction in the Summit County Court of Common Pleas. This Court affirms.

I

{¶2} Thomas communicated with Tiesha Bewley on Facebook for several weeks before the two agreed to meet. Thomas, who lived with his father, gave Bewley directions to his street and met her outside when she arrived in her car. Thomas took Bewley inside where he engaged in oral sex and vaginal intercourse with her. Bewley later drove home and contacted her close friend. Bewley told her friend that Thomas had raped her, and the two went to St. Thomas Hospital. Thomas soon learned that Bewley had accused him of rape and repeatedly called her cell phone and sent her text messages for the next several days. Thomas also sent Bewley the following message on Facebook: "stupid b***h RIP an best believe i meant it ima find u." (Sic.)

{¶3} When the police interviewed Thomas, he initially stated that he never touched Bewley because she was intoxicated. Thomas later admitted, however, that he had engaged in both oral sex and vaginal intercourse with Bewley. He also admitted that he held her arms down during the encounter. A grand jury indicted Thomas on one count of rape in violation of R.C. 2907.02(A)(2). The matter proceeded to a jury trial, at the conclusion of which the jury found Thomas guilty. The court sentenced him to eight years in prison.

{¶4} Thomas now appeals from his conviction and raises two assignments of error for our review. For ease of analysis, we reorder the assignments of error.

II

Assignment of Error Number Two

THE GREATER WEIGHT OF THE EVIDENCE PRESENTED AT TRIAL DEMONSTRATED THAT APPELLANT DID NOT COMMIT THE OFFENSE, THUS APPELLANT'S CONVICTION FOR RAPE WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶5} In his second assignment of error, Thomas argues that his conviction is against the manifest weight of the evidence. Specifically, he argues that the jury lost its way by choosing to believe the State's version of the events. We disagree.

{¶6} In determining whether a conviction is against the manifest weight of the evidence an appellate court:

> must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). A weight of the evidence challenge indicates that a greater amount of credible evidence supports one side of the issue than supports the other. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). Further, when reversing a

conviction on the basis that the conviction was against the manifest weight of the evidence, the appellate court sits as the "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony. *Id.* Therefore, this Court's "discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). *See also Otten*, 33 Ohio App.3d at 340.

{¶7} Bewley testified that she began communicating with Thomas online in June 2011 and only knew him as "Tizz" because that was his online moniker. Bewley agreed to meet Thomas on July 15, 2011, after she finished babysitting her godson. Bewley drove to Thomas' house, and the two sat down in the living room. According to Bewley, Thomas began to tell her that he loved her and wanted to marry her. Thomas then started kissing Bewley's neck and touching her body with his hands. Bewley stopped Thomas and told him that she did not want to have sex. After a brief period, however, Thomas started touching Bewley again and tried to push her down on the couch. Bewley repeatedly told Thomas "no" and that she did not want to engage in sexual activity, but Thomas continued his advances, told Bewley "not to fight it," and threatened to hit her if she did not stop struggling. Thomas held Bewley's arms back and removed her shorts. He then performed oral sex on her while she tried to push him away. Subsequently, Thomas stopped, climbed on top of Bewley, held her arms down, and engaged in vaginal intercourse with her. Bewley testified that she was crying during the encounter, but Thomas would not stop. Before she drove home, Bewley testified, Thomas apologized to her and told her that he knew she did not feel the same way about him as he did about her.

{¶8} Bewley went to St. Thomas Hospital with a friend within a few hours of leaving Thomas' house. Yvonne Demyan, a registered nurse, performed Bewley's exam and testified

that Bewley did not appear to be intoxicated. The swabs that Nurse Demyan collected from Bewley's rape exam kit were later forwarded to the Bureau of Criminal Identification and Investigation ("BCI") for forensic analysis. Christine Hammett, a BCI forensic scientist, identified semen on the samples from Bewley's vaginal and anal swabs as well as amylase, a component of saliva, on a swab of Bewley's neck. Lynda Eveleth, another BCI forensic scientist, conducted a DNA analysis on the swabs and compared her findings to a swab the police obtained from Thomas. Eveleth testified that, because sperm cells were present on the swabs taken from Bewley, she also was able to test those cells in her analysis. Eveleth concluded that the other DNA profile she discovered on Bewley's swabs was consistent with Thomas'.

{¶9} Detective Robert Richardson testified that he went to St. Thomas Hospital to conduct Bewley's initial interview. He described Bewley as very withdrawn and soft-spoken during the interview. Although Bewley only knew Thomas by the name "Tizz," she was later able to provide Detective Richardson with Thomas' cell phone number because he repeatedly had called Bewley and had sent her text messages after he learned that she had accused him of rape. Detective Richardson compiled a photo array containing Thomas' picture and another detective presented the array to Bewley. Bewley positively identified Thomas in the array.

{¶10} Detective Richardson spoke to Thomas at the police station on the day of his arrest. One of the officers who arrested Thomas wrote in his incident report that Thomas had stated that "the victim was drunk and that he didn't do anything." The other arresting officer, Officer Christopher Schnee, testified that Thomas stated: "I knew this was going to happen. That is why I didn't mess with that girl, she was so drunk." When Thomas first spoke with Detective Richardson, he also denied having had vaginal intercourse with Bewley. Later in the

interview, however, Thomas admitted that he had sex with Bewley, he heard her say she did not want to have sex, and he held down her arms to have sex with her. Similarly, Thomas initially denied having performed oral sex on Bewley, but later admitted that he did so.

{¶11} Thomas testified that he and Bewley communicated for several months via Facebook before she drove to his house on the night of July 15, 2011. Thomas denied that he ever told the police he had not touched Bewley because she was intoxicated. According to Thomas, Bewley immediately removed his penis from his shorts when she entered his house and began fondling him. The two sat down on the couch where Thomas kissed Bewley's neck and she continued to fondle him. Thomas described Bewley's behavior throughout the encounter as "misleading." Thomas stated that Bewley was "trying to play like she was not easy," pushing him away but then later allowing him to touch her. Thomas denied ever holding down Bewley's arms. According to Thomas, he only told Detective Richardson that he had held down Bewley's arms to avoid being repeatedly asked the same question. Although Thomas admitted that he initially lied to the police, he insisted that he later told the truth when he stated that the sex he had with Bewley was consensual. Yet, Thomas admitted on cross-examination that it was possible Bewley had told him "no" when he had sex with her.

{¶12} Thomas also presented the testimony of his father, Daran Thomas, Sr., and his father's girlfriend, Alesia Code. Both testified that they shared a home with Thomas, they were upstairs on the night of July 15, 2011, and they never heard any commotion or cries for help. Bewley admitted, however, that she never screamed or yelled for help when Thomas forcibly engaged in sexual activity with her. Bewley only testified that she told Thomas "no" and asked him to stop. Moreover, while Thomas testified that both his father and Code came downstairs during Bewley's visit, neither Thomas, Sr. nor Code testified that they witnessed Thomas and

Bewley engaging in any sexual activity. Thomas, Sr. testified that he came downstairs immediately when Bewley arrived to see who had come to the house. Notably, Thomas, Sr. did not testify that he saw Bewley fondling his son's penis, as Thomas claimed that Bewley did as soon as she entered the house.

{¶13} Based on our review of the record, we cannot conclude that the jury lost its way by finding Thomas guilty of rape. A jury is free to believe or reject the testimony of each witness, and issues of credibility are primarily reserved for the trier of fact. *State v. Frazier*, 9th Dist. No. 25654, 2012-Ohio-790, ¶ 56. Further, "[a] verdict is not against the manifest weight of the evidence because the jury chose to believe the State's witnesses rather than the defense witnesses." *State v. Andrews*, 9th Dist. No. 25114, 2010-Ohio-6126, ¶ 28. The jury simply chose to believe Bewley's testimony that Thomas forcibly engaged in sexual activity with her. Having reviewed the record, this is not the exceptional case where the jury clearly lost its way. *Otten*, 33 Ohio App.3d at 340. Thomas' rape conviction is not against the manifest weight of the evidence. His second assignment of error is overruled.

Assignment of Error Number One

THE LIMITING INSTRUCTION GIVEN BY THE TRIAL COURT REGARDING IMPROPER TESTIMONY WAS INSUFFICIENT TO CURE THE PREJUDICIAL EFFECT OF SAID TESTIMONY; THEREFORE, THE TRIAL COURT'S FAILURE TO DECLARE A MISTRIAL SUA SPONTE CONSTITUTED PLAIN ERROR.

{¶14} In his first assignment of error, Thomas argues that the trial court committed plain error when it failed to order a mistrial. We disagree.

{¶15} "Mistrials need be declared only when the ends of justice so require and a fair trial is no longer possible." *State v. Franklin*, 62 Ohio St.3d 118, 127 (1991). "The essential inquiry on a motion for mistrial is whether the substantial rights of the accused are adversely

affected." *State v. Wooden*, 9th Dist. No. 21138, 2003-Ohio-1917, ¶ 33, quoting *Wadsworth v. Damberger*, 9th Dist. No. 3024-M, 2000 WL 1226620, *2 (Aug. 30, 2000). If a defendant fails to move for a mistrial once he discovers the grounds that would form the basis for his motion, then he forfeits all but a claim of plain error. *State v. Wood*, 9th Dist. No. 06CA0044-M, 2007-Ohio-2673, ¶ 21-23.

> Under Crim.R. 52(B), [p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court. By its very terms, the rule places three limitations on a reviewing court's decision to correct an error despite the absence of a timely objection at trial. First, there must be an error, i.e., a deviation from a legal rule. Second, the error must be plain. To be plain within the meaning of Crim.R. 52(B), an error must be an obvious defect in the trial proceedings. Third, the error must have affected substantial rights. We have interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial.

(Internal citations and quotations omitted.) *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). The burden is on the party asserting plain error to prove that "the outcome 'would have been different absent the error.'" *State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, ¶ 17, quoting *State v. Hill*, 92 Ohio St.3d 191, 203 (2001).

{¶16} Thomas argues that the trial court should have sua sponte ordered a mistrial after one of the State's witnesses commented on the victim's credibility. Specifically, the following exchange took place during the State's redirect examination of Nurse Demyan:

> [PROSECUTOR:] * * * And as a health care provider, * * * your training and your experience has been as a nurse for a decent amount of time, is your role in carrying out your health care duties to question the truthfulness of what a patient is telling you?

> [NURSE DEMYAN:] No, ma'am. I am not supposed to ask whether they are telling the truth or not. I take what they are telling me as the truth. They wouldn't be there if they weren't telling the truth.

Defense counsel immediately objected to the foregoing statement, and the trial court sustained the objection. The court also instructed the jury "to disregard the last statement." Thomas never

requested a mistrial, but argues on appeal that a mistrial was warranted because the court's instruction was insufficient to cure Nurse Demyan's improper statement.

{¶17} We do not agree that the trial court committed plain error by not ordering a mistrial. Initially, we note that the prosecutor's redirect examination of Nurse Demyan was the result of the approach defense counsel employed on cross-examination. Defense counsel asked Nurse Demyan all of the following questions:

> [DEFENSE COUNSEL:] So the fact that they put rape on [a rape kit] doesn't mean a rape occurred, right?
>
> * * *
>
> [DEFENSE COUNSEL:] * * * [L]et's say somebody was lying about being sexually assaulted and they came in and told you that they were sexually assaulted, would you still do the exam?
>
> * * *
>
> [DEFENSE COUNSEL:] * * * So if somebody came in and lied to you about rape, you would do the same paperwork that you would do on a real rape; is that correct?
>
> * * *
>
> [DEFENSE COUNSEL:] * * * If it was a false claim of rape, you would still put somebody down as the perpetrator in your forms, right?
>
> * * *
>
> [DEFENSE COUNSEL:] Well, let me ask you, if you detected that somebody might be lying to you in one of these exams, what would you do?
>
> * * *
>
> [DEFENSE COUNSEL:] * * * [Y]ou wouldn't question anybody in that room, would you, about whether they were sexually assaulted, that is not your job. Is that what you are telling us?

Some of the responses Nurse Demyan gave to defense counsel's cross-examination parallel the response Thomas claims warranted a mistrial. For example, Nurse Demyan gave the following responses to various questions on cross examination: "[m]y job is to take the sexual assault as

[the victim] sees it"; "as far as I know [victims] are not lying to me"; and "[people who come to the DOVE unit] have to be sexually assaulted for me to do a sexual assault exam." Thomas fails to explain how Nurse Demyan's response to the State's redirect examination meaningfully differed from the responses his counsel elicited on cross-examination or why the invited-error doctrine should not apply in this instance. *See State v. Hairston*, 9th Dist. No. 05CA008768, 2006-Ohio-4925, ¶ 50, quoting *Lester v. Leuck*, 142 Ohio St. 91 (1943), syllabus ("Invited error prohibits a party from 'tak[ing] advantage of an error which he himself invited or induced the trial court to make.'")

{¶18} In any event, Thomas has not shown that the outcome of the trial would have been different even absent Nurse Demyan's statement on redirect examination. *See Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, at ¶ 17, quoting *Hill*, 92 Ohio St.3d at 203. The trial court instructed the jury to disregard the improper statement and also later instructed the jury that jurors "are the sole judges of the facts, the credibility of the witnesses[,] and the weight of the evidence." As this Court has repeatedly held, "[t]here is a presumption that the jury follows the instructions given by the judge." *State v. Mohamed*, 9th Dist. No. 11CA0050-M, 2012-Ohio-3636, ¶ 27. Further, Bewley testified at trial, so the jurors were able to assess her credibility for themselves. Bewley testified that Thomas forced her to engage in sexual activity, consistent with her statements to the police. Meanwhile, Thomas admittedly lied to the police. Thomas has not shown that the jury would not have convicted him even absent Nurse Demyan's statement. As such, he has not shown that the trial court committed plain error by failing to order a mistrial. Thomas' first assignment of error is overruled.

III

{¶19} Thomas' assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

BETH WHITMORE
FOR THE COURT

CARR, J.
BELFANCE, J.
CONCUR.

APPEARANCES:

THOMAS M. DICAUDO, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and RICHARD S. KASAY, Assistant Prosecuting Attorney, for Appellee.